KANT SLIP FEDERAL CREDIT UNION, INC., APPELLEE, *v.* DUDLEY, ADMR., BUREAU OF UNEMPLOYMENT COMPENSATION, APPELLANT.

(No. 7995—Decided April 12, 1966.)

*Mr. Claude E. Clarke* and *Mr. Clifford G. Niemeyer,* for appellee.

*Mr. William B. Saxbe,* attorney general, and *Mr. Anthony R. Kidd,* for appellant.

DUFFEY, J. This is an appeal from a judgment of the Common Pleas Court of Franklin County reversing a determination of the Administrator, Bureau of Unemployment Compensation. The administrator had held that appellee, Kant Slip Federal Credit Union, was an employer amenable to the Unemployment Compensation Law, Chapter 4141, Revised Code. The court held that Kant Slip Federal Credit Union was not amenable.

As its name implies, Kant Slip is a credit union organized in 1936 under federal law. It is a corporation; a distinct legal entity, operating through its board of directors. During 26 years of its operations, federal law denied unemployment coverage to credit unions and their employees. On January 1, 1962, an amendment providing coverage became effective. Kant Slip has four persons who perform the work of the credit union —a manager and three secretaries. If these persons are employees of Kant Slip within the meaning of Chapter 4141, Revised Code, this credit union corporation is unquestionably subject to the Unemployment Compensation Law. However, appellee contends that these four persons are employees of The Standard Register Company of Dayton, Ohio, and are not employees of Kant Slip within the statutes.

Like many credit unions, Kant Slip was organized for the benefit of the employees of a business. The corporation's services are available exclusively to the employees of The Standard Register Company presently amounting to a force of about 2,600. From the beginning, the relationship between the corporation and Standard has been very close, and Standard has encouraged and even subsidized its operations. At the inception of the credit union in 1936, Standard assigned personnel from Standard's payroll to work in the corporation's office. This general arrangement has been followed ever since and was made more definite and formal by a contract.

Standard's personnel department hired all four staff members and assigned them to the credit union. One of the secretaries was hired and assigned directly to the credit union. The others commenced work in a department of the company and were later assigned to the credit union corporation. All four are carried on Standard's payroll and treated as Standard employees for all purposes, i. e., social security, workmen's com-

pensation, unemployment compensation, retirement, etc. Under the contract, Standard retains the right to withdraw a person and reassign him to a department of the company.

These four persons perform only credit union work and are full time. The credit union's corporate board of directors has full authority over its operations. Under its articles, the manager is fully subject to the board's supervision and control. The secretaries are under the immediate control and supervision of the manager.

Paragraph 6 of the contract between Standard and the credit union corporation provides:

"6.) The Credit Union shall have the immediate supervision and control over the members of the office staff of the Credit Union during the time they may be performing their duties in that capacity."

The credit union can refuse to accept a person offered to it by Standard and can dismiss from its service any person on its staff. It cannot, of course, dismiss such a person from his relationship with Standard, and, therefore, such a person would return to the immediate control and supervision of Standard.

The four staff members are not paid directly by the credit union corporation. Under the contract, Standard sets the person's wage under Standard's payroll. The credit union reimburses Standard for their services. Under the terms of paragraph four of the contract, it would appear that the credit union may determine for itself what rate of compensation is acceptable to it and pay that amount to Standard. In actual practice, the credit union appeared to be paying Standard an amount equal to the direct wages of the staff.

Section 4141.01, Revised Code, as pertinent here, provides:

"(A) 'Employer' means any * * * type of organization including any * * * corporation * * * who * * * had in employment three or more individuals at any one time within a calendar year.

"Each individual employed to perform or to assist in performing the work of any agent or employee of an employer is employed by such employer for all the purposes of such sections, whether such individual was hired or paid directly by such employer or by such agent or employee, provided the employer had actual or constructive knowledge of the work. * * *.

"(B) 'Employment' means service performed for wages under any contract of hire, written or oral, express or implied, * * * "

Appellee has stressed the 26-year history of the staff being treated as employees of Standard. It has also been pointed out that since they were included on Standard's payroll there has been no "circumvention" of the Unemployment Compensation Law. These points beg the question of this suit. During the first 26 years of the corporation's existence, there was no reason for the bureau to assess the credit union. Further, there may be a circumvention of the law not only in the sense of a denial of coverage to persons entitled to it, but in the sense of providing coverage to persons not entitled to it. However, whatever may have been the propriety of the historical treatment of the office staff, this action involves only the status from 1962.

It is clear that the office staff are employees of the credit union corporation within the doctrine of *respondeat superior.* They are at least "loaned servants." The credit union corporation would be liable in tort for their actions while engaged in their duties. It is equally clear that they are employees of the credit union "within the meaning of the Workmen's Compensation Act." See *Daniels* v. *MacGregor Co.* (1965), 2 Ohio St. 2d 89. However, it is appellee's position that even so there is no "contract of hire" between the office staff and the credit union corporation as that term is used in Section 4141.01 (B), Revised Code.

A contract of hire within the meaning of the statute can be implied from the facts of the relationship between the staff, the credit union corporation and Standard. The existence of a contract of hire depends upon the legal attributes of such a relationship. While the "intent" to form such a contract in the sense of saying so is helpful in determining its existence, such an intent is hardly necessary. Clearly, too, the fact that the parties do not characterize their relationship as a contract of hire and say that they are not employees may be relevant evidence but cannot control the legal characterization of their status. The parties cannot prevent the creation of a contract of hire by the mere device of calling it something else. As is

true of a trust or a partnership, it is the law which defines the attributes, and if those attributes exist, then it is the law which characterizes it as a contract of hire.

In our opinion, the situation in this case is well summarized by the Supreme Court in *Daniels v. MacGregor Co.* (1965), 2 Ohio St. 2d 89, at 94:

"* * * In the instant case, plaintiff's agreement with Manpower contemplated that Manpower would pay plaintiff for work for a customer of Manpower such as MacGregor, who was to have the right to control the manner and means of performing the work and who was to pay Manpower at least enough so that Manpower could pay plaintiff what he was willing to accept for doing that work. In effect, the agreement between plaintiff and Manpower was such that plaintiff can be said to have authorized Manpower to offer to MacGregor plaintiff's services as an employee of MacGregor so that, after acceptance by MacGregor of that offer, there was a contractual relationship among the three under which Manpower was to make certain payments on behalf of MacGregor to and for plaintiff, plaintiff was to work as an employee for MacGregor, and MacGregor was to make certain payments to Manpower."

In our opinion, the office staff also constituted employees of the credit union under the provisions of Section 4141.01 (A), Revised Code, relating to employees of an agent of the employer.

Under the statute it is not necessary that the contract of hire be one directly between the credit union corporation and the staff members, although in our opinion such a contract may be implied.

If the staff has been employed by the agent of the credit union to perform work for the credit union as the principal, the corporation is brought within the act.

In the present case, Standard is clearly not an independent contractor performing a service or job for the credit union corporation. See *Daniels v. MacGregor Co.* (1965), 2 Ohio St. 2d 89, at 94. In our opinion, Standard has acted as the agent of the credit union and contracted with employees in its own name to perform work for and under the supervision and control of the credit union corporation. The fact that Standard

in so contracting in its own name has agreed to provide those persons with benefits in excess of the reimbursement it receives from the principal does not affect our conclusion.

The judgment of the Common Pleas Court will be reversed and vacated.

*Judgment reversed.*

BRYANT, P. J., and DUFFY, J., concur.